IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICKY CARDENAS,

    Plaintiff,

vs.                                                                                    Civ. No. 15-880 KG/SCY

MICHAEL COLLINS, LLOYD GARCIA,
LENNY QUINTANA, and CHRISTOPHER
MEDINA, in their individual capacities,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants Quintana and Medina's Motion for Summary Judgment (Motion for Summary Judgment), filed January 15, 2016, in which Defendants Lenny Quintana and Christopher Medina (EMT Defendants) request dismissal of all of Plaintiff's claims against them and seek an award of costs. (Doc. 22). Plaintiff filed a response on February 8, 2016, and EMT Defendants filed a reply on March 14, 2016. (Docs. 25 and 26). Having considered the Motion for Summary Judgment and the accompanying briefing, the Court grants the Motion for Summary Judgment in part, and denies EMT Defendants' request for an award of costs.

A. Background

    *1. The Complaint for Civil Rights Violations and Damages (Doc. 1-1) (Complaint)*

This is a 42 U.S.C. § 1983 civil rights lawsuit. The Complaint arises from a 911 medical emergency call to which EMT Defendants responded as did Taos Police Department officers, Defendants Michael Collins and Lloyd Garcia (TPD Defendants). The 911 call ultimately resulted in EMT Defendants transporting Plaintiff by ambulance, against his will, to a hospital

where Plaintiff contends his blood was drawn, without his consent, for drug testing. (Doc. 1-1) at ¶¶ 9, 10, 14, 18, and 19. TPD Defendants did not charge Plaintiff with any crimes. *Id.* at ¶ 21.

Pertinent to this Motion for Summary Judgment, Plaintiff brings Fourth and Fourteenth Amendment unlawful seizure claims against EMT Defendants in Count I of the Complaint. In Count III, Plaintiff brings Fourth and Fourteenth Amendment unlawful search claims against EMT Defendants for the blood draw at the hospital. EMT Defendants now move for summary judgment on the Fourth and Fourteenth Amendment unlawful seizure and search claims, which would dismiss all of Plaintiff's claims against EMT Defendants.

*2. Facts Viewed in the Light Most Favorable to Plaintiff*

At about 3:00 p.m. on September 3, 2012, Plaintiff became upset and began crying while he was working at his restaurant. (Doc. 25-2) at ¶ 2. Plaintiff "went outside alone, and sat down behind the restaurant to collect" himself. *Id.* at ¶ 3. He did not lose consciousness and "remained coherent and alert throughout the incident ...."[1] *Id.* at ¶ 4.

Nonetheless, at about the same time, TPD received an emergency call wherein the caller stated that a 62 year old male was "IN A DIABETIC STATE" and was "GOING IN AND OUT OF CONSCIOUSNESS." (Doc. 25-1). When EMT Defendants and their ambulance arrived at the restaurant, a few people had come out of the restaurant to "check on" Plaintiff and "try to calm" him down. (Doc. 25-2) at ¶ 6. No one from the restaurant held Plaintiff down nor did Plaintiff touch any of them.[2] *Id.*

---

[1] Defendant Collins states in his Incident Narrative that bystanders stated Plaintiff had collapsed and that, when he came to, Plaintiff was "agitated, disoriented and combative." (Doc. 25-5) at 1.

[2] EMT Defendants, however, attest that they saw three to four people holding Plaintiff when they arrived at the restaurant, and that Plaintiff was lethargic yet "combative and belligerent." (Doc. 22-1) at ¶¶ 4 and 6; (Doc. 22-2) at ¶¶ 4 and 6.

2

Upon arriving at the restaurant, EMT Defendants each tightly grabbed Plaintiff's arms in an attempt to assess Plaintiff's vital signs.[3] *Id.* at ¶ 7; (Doc. 22-1) at ¶ 7; (Doc. 22-2) at ¶ 7. Plaintiff repeatedly asked EMT Defendants to let go, but they refused to do so. (Doc. 25-2) at ¶ 7. Plaintiff explained to EMT Defendants that he was "upset" about his son, who was in jail and facing a murder charge. *Id.* at ¶ 8. Plaintiff further stated that he needed to go back to work. *Id.*

EMT Defendants continued to hold Plaintiff and stated that they needed to take Plaintiff to the hospital. *Id.* at ¶ 9. EMT Defendants finally let go of Plaintiff after he pretended he was going to bite them. *Id.* While speaking to EMT Defendants, TPD Defendants arrived. *Id.* at ¶ 10. One of the TPD Defendants accused Plaintiff of being on drugs[4] and threatened Plaintiff with jail if he lied about taking drugs.[5] *Id.*

To get Defendants to leave, Plaintiff allowed EMT Defendants to check his vital signs and take a blood glucose level test, which was normal.[6] *Id.* at ¶ 11; (Doc. 22-1) at ¶ 15. After EMT Defendants examined Plaintiff, he began to walk back to his restaurant. (Doc. 25-2) at ¶ 12. As he was walking, one of the TPD Defendants grabbed Plaintiff and stated that Plaintiff

---

[3] Defendant Collins observes in his Incident Narrative that those trying to hold Plaintiff's arms did so because he was "flailing and swinging" his arms. (Doc. 25-5) at 1.

[4] Defendant Collins observed that Plaintiff's feet, fingers, and hands were twitching; Plaintiff was "sweating a lot;" Plaintiff's eyes were open "in an exaggerated manner;" Plaintiff was attempting to bite EMT Defendants; and that Plaintiff was yelling throughout the incident and would not calm down. (Doc. 25-5) at 1.

[5] Defendant Collins states in his Incident Narrative that he explained to Plaintiff that he was concerned for Plaintiff's "safety and health," and told Plaintiff he could either voluntarily speak with a doctor or be held up to 72 hours for an evaluation. (Doc. 25-5) at 1. According to Defendant Collins, Plaintiff refused to speak with a doctor, so Defendant Collins advised EMT Defendants that he would be signing the form to hold Plaintiff and that Plaintiff would be transported. *Id.*

[6] According to EMT Defendants' Prehospital Care Report, Plaintiff allowed EMT Defendants to check his vital signs after TPD Defendants told Plaintiff that he could choose to be examined or "go by Police to" the hospital. (Doc. 25-3) at 1.

3

"would have to be tested for drugs." *Id.* After Plaintiff refused to be tested, one of the TPD Defendants forced Plaintiff into the ambulance[7] and onto a gurney. (Doc. 25-2) at ¶ 12.

Plaintiff's sister, Betty Cox, arrived at the scene when Plaintiff was already in the ambulance. (Doc. 25-4) at ¶ 4. Cox climbed into the ambulance through the passenger-side door and saw that Plaintiff was face-down on a gurney. *Id.* at ¶ 5. When Plaintiff attempted to get up from the gurney, a TPD Defendant "slammed" Plaintiff back onto the gurney with his knee on Plaintiff's back and jerked Plaintiff's right arm up to handcuff him.[8] *Id.* at ¶ 6; (Doc. 25-2) at ¶ 12. This action caused sprains and strains of Plaintiff's right shoulder and upper arm. (Doc. 25-8). Cox told Defendants, repeatedly, to leave Plaintiff alone, that Plaintiff did not want to go to the hospital, and that she would care for him, but Defendants ignored her. (Doc. 25-4) at ¶ 7.

EMT Defendants then drove Plaintiff to the hospital against Plaintiff's will. (Doc. 25-2) at ¶ 13. During the ambulance ride, Plaintiff was handcuffed to the gurney and strapped face-down onto the gurney making it difficult for him to breathe. *Id.* at ¶¶ 13 and 16. Plaintiff stated to EMT Defendants that he was not going to pay for the ambulance and medical expenses, which he incurred against his will. *Id.* at ¶ 15. He did not threaten to harm himself or others during the entire incident.[9] *Id.* at ¶ 14.

---

[7] Defendant Collins states in the Incident Narrative that EMT Defendants put Plaintiff in the ambulance. (Doc. 25-5) at 1. Defendant Collins further states that Plaintiff "remained upset and combative" while in the ambulance. *Id.*

[8] EMT Defendants attest that Plaintiff initially agreed to go to the hospital but then became "very combative" causing TPD Defendants to handcuff him behind his back in order to transport him to the hospital. (Doc. 22-1) at ¶ 12; (Doc. 22-2) at ¶ 12.

[9] EMT Defendants state in their Prehospital Care Report that Plaintiff was "combative." (Doc. 25-3). Moreover, EMT Defendants' training and experience led them to believe that Plaintiff "was a danger to himself and others and that it was necessary to transport him to" the hospital. (Doc. 22-1) at ¶ 10; (Doc. 22-2) at ¶ 10. According to EMT Defendants, Plaintiff threatened bystanders and continued to threaten EMT Defendants on the way to the hospital. (Doc. 22-1) at ¶¶ 8 and 13; (Doc. 22-2) at ¶¶ 8 and 13.

Once at the hospital, Plaintiff was seated in a chair and TPD Defendants handcuffed Plaintiff to a bed. *Id.* at ¶ 17. After one of the TPD Defendants spoke with hospital staff, a nurse drew Plaintiff's blood without his consent. *Id.* at ¶ 18. EMT Defendants did not draw Plaintiff's blood at the hospital nor did they assist in doing so. (Doc. 22-1) at ¶ 14; (Doc. 22-2) at ¶ 14. Plaintiff was subsequently released from the hospital about an hour later. (Doc. 25-2) at ¶ 19.

*B. Discussion*

EMT Defendants argue first that they are entitled to qualified immunity for the Fourth Amendment unlawful seizure and search claims. EMT Defendants further argue that they are immune from suit on the Fourth and Fourteenth Amendment claims under the community caretaker doctrine. Should the Court grant the Motion for Summary Judgment, EMT Defendants seek an award of costs. Plaintiff opposes the Motion for Summary Judgment.

*1. Fourth Amendment Unlawful Search and Seizure Claims: Qualified Immunity*

*a. Standard of Review for Summary Judgment and Qualified Immunity*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

5

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014). Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity. *Id*. "This is a heavy burden." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1208 (10th Cir. 2017).

At the summary judgment stage, the Court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker*, 745 F.3d at 411. "[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). As the Tenth Circuit recently clarified:

> "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, "existing precedent must have placed the statutory or constitutional question 'beyond debate.'" "The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established.'" In the Fourth Amendment context, "the result depends very much on the facts of each case," and the precedents must "squarely govern" the present case. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Garcia v. Escalante*, 2017 WL 443610, at *4 (10th Cir.) (quoting *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (citations omitted)). The United States Supreme Court has "emphasized that the clearly-established inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. ___, 136 S.Ct. 305, 308 (2015)). On the other hand, "[t]he law is also clearly established if the

6

conduct is so obviously improper that any reasonable officer would know it was illegal." *Id.* (quoting *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015)).

Whether a defendant's conduct is objectively reasonable under the second prong of the qualified immunity analysis is a legal question, but a factual question may arise when there is a dispute regarding the historical facts material to the objectively reasonable issue. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citation omitted) (holding that objective legal reasonableness of officer's actions is legal question whereas "where the 'historical facts material to [that] issue are in dispute [there] ... [is] an issue for the jury.'" (citation omitted)). The Tenth Circuit Court of Appeals further instructs,

> [i]f the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity. If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that "no genuine issues of material fact" exist and that the defendant "is entitled to judgment as a matter of law." In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be "properly denied."

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citations omitted).

### b. Fourth Amendment Unlawful Seizure Claims

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons … against unreasonable … seizures." In the context of medical personnel such as EMTs, the Sixth Circuit determined that paramedics do not unreasonably seize an individual if they acted solely to provide medical aid. *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 222 (6th Cir. 2007) (holding that paramedics did not unreasonably seize unconscious individual "because the paramedics acted in order to provide medical aid" and did not act "to enforce the law, deter or incarcerate."). On the other

7

hand, the Second Circuit has held that EMTs cannot seize individuals and transport them to hospitals if they "competently and voluntarily declined [medical] treatment." *Green v. City of New York*, 465 F.3d 65, 84 (2nd Cir. 2006). The Second Circuit further explained that EMTs can seize an individual who is "incompetent to make decisions concerning his treatment or is a threat to himself or others." *Id.* at 84.

Plaintiff cites several cases and the New Mexico Emergency Detention statute for the proposition that EMT Defendants needed probable cause that Plaintiff was a danger to himself or others in order to seize him. *See Meyer v. Bd. of Cty. Comm'rs of Harper Cty., Okla.*, 482 F.3d 1232, 1239 (10th Cir. 2007) (holding that police officers' seizure of individual for emergency mental health evaluation must be supported by probable cause that officers believe "individual poses a danger to himself or others"); *Scott v. Hern*, 216 F.3d 897, 905, 910 (10th Cir. 2000) (Due Process Clause requires psychiatrist to reasonably believe individual is danger to himself or others before certifying individual should receive temporary involuntary mental health treatment at mental health hospital); *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 590 (10th Cir. 1999) (agreeing with plaintiffs that police officers who seize and transport individuals to detox center must have probable cause to believe individuals are danger to themselves or others); *Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996) (holding in case involving seizure by police officers that "[b]ecause a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive, we conclude that the 'probable cause' standard applies here, as do the New Mexico statutory provisions"); *Moore v. Wyoming Medical Center*, 825 F.Supp. 1531,1547 (D. Wyo. 1993) (finding factual disputes regarding whether paramedic defendants detained plaintiff in accordance with Wyoming Emergency Detention statute, which requires examiner

have "reasonable cause" to believe person is mentally ill); and NMSA 1978, § 43-1-10(A)(3) (2010 Repl. Pamp.) (New Mexico Emergency Detention statute).

These cases and Section 43-1-10(A)(3), however, are distinguishable from this case for several reasons. First, *Meyer*, *Anaya,* and *Pino* apply to seizures by police officers, not EMTs or other medical personnel. Second, *Scott* applies to psychiatrists who certify that a short-term involuntary commitment to a mental hospital is necessary, whereas EMT Defendants are not psychiatrists and merely transported Plaintiff to a medical hospital. The Tenth Circuit in *Scott* also addressed the issue of commitment in the context of the Due Process Clause, not the Fourth Amendment. Finally, although *Moore* involved a detention by paramedics, the district court discusses application of the Wyoming Emergency Detention statute, which allows paramedics to detain individuals if they have reasonable cause to believe the individual is mentally ill and dangerous. Unlike the Wyoming Emergency Detention statute, the New Mexico Emergency Detention statute applies only to peace officers, not medical personnel like EMTs. NMSA 1978, § 43-1-10(A) ("A peace officer may detain and transport a person for emergency mental health evaluation and care in the absence of a legally valid order from the court" under certain circumstances).

It is undisputed that EMT Defendants initially seized Plaintiff by holding his arms in an attempt to assess Plaintiff's vital signs, presumably based on the 911 call about a diabetic state and loss of consciousness. Considering the undisputed nature of the 911 call and Plaintiff's admittedly "upset" state, no reasonable jury could find that EMT Defendants were attempting to achieve any other goal than to provide medical aid when they held Plaintiff's arms, and, therefore, no reasonable jury could find that EMT Defendants unreasonably seized Plaintiff by the arms. *See* (Doc. 25-2) at ¶ 2 ("I became upset and started crying."); *Peete*, 486 F.3d at 222

(seizure by paramedic reasonable if purpose is to provide medical aid). However, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that after Plaintiff allowed EMT Defendants to check his vital signs and test his blood glucose level, which was normal, EMT Defendants accomplished the purpose of the 911 call. Moreover, a reasonable jury could find that Plaintiff was competent to voluntarily decline any further medical treatment. On the other hand, Plaintiff admits that he "pretended" to bite EMT Defendants as they held his arms. Of course, EMT Defendants did not know that Plaintiff was just pretending to bite them and reasonably could believe that Plaintiff was a threat to them. In view of this apparent threat to EMT Defendants and Plaintiff's upset state, no reasonable jury could find that it was unreasonable for EMT Defendants to transport Plaintiff, against his will, to the hospital for further medical evaluation, including drug testing. Hence, Plaintiff has not shown that EMT Defendants violated his Fourth Amendment right to be free from an unreasonable seizure.

Although the qualified immunity analysis ends with the determination that Plaintiff has not carried his heavy burden of demonstrating that EMT Defendants violated his Fourth Amendment right to be free from an unreasonable seizure, the Court, nevertheless, addresses the second prong of the qualified immunity analysis: after EMT Defendants received a 911 call reporting a diabetic condition and consciousness issues, does Plaintiff, who was upset, have a clearly established right not to be seized by EMT Defendants when they (1) initially held Plaintiff by the arms to assess his vital signs, and (2) drove Plaintiff to the hospital for further medical evaluation, including drug testing, after Plaintiff appeared to try to bite them.

Plaintiff also cites *Meyer*, *Anaya, Pino*, and *Moore* to show that he meets the second prong of the qualified immunity analysis. As discussed above, *Meyer*, *Anaya,* and *Pino* involved police officers, not EMTs, seizing individuals for mental health evaluations, while *Moore*

10

involved the Wyoming Emergency Detention statute, which, unlike the New Mexico Emergency Detention statute, applies to EMTs. These cases do not demonstrate that it is "beyond debate" that the particular conduct at issue here (New Mexico EMTs seizing an upset individual by the arms to assess his vital signs when a 911 caller reported diabetic and consciousness issues, and seizing that individual in order to drive him to the hospital for further medical evaluation, including drug testing, after that individual apparently tried to bite them) violates the Fourth Amendment. Moreover, *Moore*, a district court case, does not have the weight to create any kind of clearly established authority.

The Court notes that while *Peete* stands for the general proposition that paramedics who provide medical aid do not unreasonably seize an individual, that proposition is not clearly established law with respect to the particular facts of this case. First, *Peete*, unlike this case, involved an unconscious individual who could not competently consent to medical aid nor could that individual threaten others or herself. Second, the Sixth Circuit in *Peete* conceded that even under those specific circumstances "there are no cases applying the Fourth Amendment to paramedics coming to the aid of an unconscious individual as a result of a 911 call by a family member." 486 F.3d at 220. Finally, Plaintiff cites no binding authority holding that an EMT's restraint of an individual in the course of medically assessing that individual violates the Fourth Amendment. *See Pena v. Givens*, 637 Fed. Appx. 775, 781 (5th Cir. 2015) (finding that plaintiff did not carry burden of showing that qualified immunity did not apply when plaintiff cited "no binding authority holding that a medical professional's restraint of an individual in an emergency medical situation constitutes a Fourth Amendment seizure."). The Court, therefore, concludes that not every reasonable EMT would have understood that restraining an upset individual by the arms for a medical assessment violates the Fourth Amendment's prohibition against

unreasonable seizures

With respect to transporting an individual to the hospital, in *Green*, an analogous 2006 case involving a paramedic who transported a conscious competent individual to the hospital against his wishes, the Second Circuit held "that it was clearly established …that a competent adult could not be seized and transported for treatment unless she presented a danger to herself or others." 465 F.3d at 83. On the other hand, in 2010, the Sixth Circuit in *McKenna v. Edgell*, a case involving police officers who claimed to be acting as medical-emergency responders when they handcuffed the conscious and, apparently, competent plaintiff and removed him on a stretcher, held that, if the officers acted as medical-emergency responders, the plaintiff's "claim would amount to a complaint that he received dangerously negligent and invasive medical care," but "if any right to be free from such unintentional conduct by medical-emergency responders exists under the Fourth Amendment, it is not clearly established." 617 F.3d 432, 440 (6th Cir. 2010). Considering the above state of the law and Plaintiff's failure to otherwise provide the Court with legal authority more akin to the facts in this case, it is not sufficiently clear that every reasonable EMT would have understood that transporting an upset individual, who apparently tried to bite him, to a hospital for further medical evaluation, including drug testing, violates the Fourth Amendment's prohibition against unreasonable seizures. *See Granato v. City & Cty. of Denver*, 2011 WL 3820730 *3-6 (D. Colo.) (analyzing *Green* and *McKenna*, and concluding that plaintiff's Fourth Amendment rights were not clearly established where plaintiff was conscious, competent, and refused medical assistance but was forcibly transported by paramedics).

The Court concludes that Plaintiff has not carried his heavy burden of showing that the clearly established law prong of the qualified immunity analysis is satisfied. EMT Defendants are, therefore, entitled to qualified immunity on the Fourth Amendment unreasonable seizure

claims brought in Count I of the Complaint.

### c. Fourth Amendment Unlawful Search Claims

Plaintiff also argues that EMT Defendants violated the Fourth Amendment by unlawfully causing his blood to be drawn at the hospital without his consent. "Indeed, as the Supreme Court has noted, it is clearly established that blood tests constitute searches under the Fourth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 740 (10th Cir. 2007) (citing *Schmerber v. California*, 384 U.S. 757, 767-68 (1966)). Plaintiff, however, has not presented any evidence that EMT Defendants caused the blood draw at the hospital by requesting the draw, actually drawing the blood, or assisting in drawing the blood. Moreover, Plaintiff has not cited any legal authority to support the contention that EMTs who transport an individual for further medical evaluation, including drug testing, can be held liable under Section 1983 for a blood draw they did not participate in. *Cf. Cook v. Olathe Med. Ctr., Inc.*, 773 F.Supp.2d 990, 1002-003 (D. Kan. 2011) (determining that plaintiff was not entitled to summary judgment on Fourth Amendment claim when police officers did not order blood and urine draws and merely restrained plaintiff during draws). Under these circumstances, Plaintiff has failed to carry his heavy burden of demonstrating that (1) EMT Defendants violated Plaintiff's Fourth Amendment right to be free from an unreasonable search when hospital personnel drew Plaintiff's blood, and (2) every reasonable EMT would have understood that he or she violates the Fourth Amendment's prohibition against unreasonable searches when hospital personnel draw blood from an individual, who the EMT transported to the hospital for further evaluation. EMT Defendants are, therefore, entitled to qualified immunity with respect to the Fourth Amendment unreasonable search claims brought in Count III of the Complaint.

## 2. Community Caretaker Doctrine

EMT Defendants further argue that they are immune from suit on both the Fourth and Fourteenth Amendment claims under the community caretaker doctrine. This doctrine allows law enforcement officers to "effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'" *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007) (quoting *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)). The community caretaker doctrine also applies to searches. *United States v. Gilmore*, 776 F.3d 765, 768-69 (10th Cir. 2015) (holding that warrantless searches are *per se* unreasonable under Fourth Amendment unless subject to exception like community caretaking doctrine). Neither the cases cited by the parties nor a search of the caselaw by the Court indicate that the community caretaker doctrine applies to non-law enforcement officers such as EMTs. Consequently, the Court is hesitant to apply that doctrine to EMT Defendants. EMT Defendants have, therefore, not carried their burden of demonstrating that they are entitled to summary judgment on the Fourth and Fourteenth Amendment claims as a matter of law under the community caretaker doctrine.

## 3. EMT Defendants' Request for Award of Costs

Because EMT Defendants did not prevail entirely on their Motion for Summary Judgment and EMT Defendants did not provide any legal authority to support their request for an award of costs, the Court denies the request for an award of costs. *See* D.N.M. LR-Cv 7.3(a) ("A motion, response or reply must cite authority in support of the legal positions advanced.").

IT IS ORDERED that

1. Defendants Quintana and Medina's Motion for Summary Judgment (Doc. 22) is granted in part and denied in part;

2. summary judgment will be entered in favor of EMT Defendants as to the Fourth Amendment claims brought in Counts I and III of the Complaint;

3. those Fourth Amendment claims will be dismissed with prejudice;

4. summary judgment is denied at this time as to the Fourteenth Amendment claims brought against EMT Defendants in Counts I and III of the Complaint; and

5. EMT Defendants' request for an award of costs is denied.

_____
UNITED STATES DISTRICT JUDGE