IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICKY CARDENAS,

    Plaintiff,

vs.                                                    Civ. No. 15-880 KG/SCY

MICHAEL COLLINS, LLOYD GARCIA,
LENNY QUINTANA, and CHRISTOPHER
MEDINA, in their individual capacities,

    Defendants.

MEMORANDUM OPINION AND ORDER TO SHOW CAUSE

This matter comes before the Court upon Defendants Collins and Garcia's Motion for Summary Judgment (Motion for Summary Judgment), filed May 2, 2016, in which Defendants Taos Police Officers Michael Collins and Lloyd Garcia (collectively, TPD Defendants) request dismissal of all of Plaintiff's claims against them. (Doc. 34). Plaintiff filed a response on May 27, 2016; TPD Defendants filed a reply on July 1, 2016; and Plaintiff filed a surreply on August 2, 2016. (Docs. 36, 42, and 47). Having considered the Motion for Summary Judgment and the accompanying briefing, the Court (1) grants the Motion for Summary Judgment, in part, and (2) enters an order requiring Plaintiff to show cause why the Court should not dismiss the Fourteenth Amendment claims without prejudice under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

*A. Background*

    *1. The Complaint for Civil Rights Violations and Damages (Doc. 1-1) (Complaint)*

This is a 42 U.S.C. § 1983 civil rights lawsuit. The Complaint arises from a 911 medical emergency call which Defendants emergency medical technicians Lenny Quintana and Christopher Medina (collectively, EMT Defendants) responded to as did TPD Defendants. The

911 call ultimately resulted in EMT Defendants transporting Plaintiff by ambulance, against his will, to a hospital where Plaintiff contends his blood was drawn, without his consent, for drug testing. (Doc. 1-1) at ¶¶ 9, 10, 14, 18, and 19. TPD Defendants did not charge Plaintiff with any crimes. *Id.* at ¶ 21.

Pertinent to this Motion for Summary Judgment, Plaintiff brings Fourth and Fourteenth Amendment unlawful seizure claims against TPD Defendants in Count I of the Complaint. In Count II, Plaintiff brings Fourth and Fourteenth Amendment excessive force claims against TPD Defendants. Finally, in Count III, Plaintiff brings Fourth and Fourteenth Amendment unlawful search claims against TPD Defendants for the blood draw at the hospital. TPD Defendants now move for summary judgment on all of Plaintiff's claims against them.

*2. Facts Viewed in the Light Most Favorable to Plaintiff*

At about 3:00 p.m. on September 3, 2012, Plaintiff became upset and began crying while he was working at his restaurant. (Doc. 25-2) at ¶ 2. Plaintiff "went outside alone, and sat down behind the restaurant to collect" himself. *Id.* at ¶ 3. He did not lose consciousness and "remained coherent and alert throughout the incident."[1] *Id.* at ¶ 4.

Nonetheless, at about the same time, TPD received an emergency call wherein the caller stated that a 62 year old male was "IN A DIABETIC STATE" and was "GOING IN AND OUT OF CONSCIOUSNESS." (Doc. 25-1). Defendants did not express any concern to Plaintiff

---

[1] Defendant Collins states in his Incident Narrative that bystanders stated Plaintiff had collapsed and that, when he came to, Plaintiff was "agitated, disoriented and combative." (Doc. 25-5) at 1.

2

about cardiac issues.[2] (Doc. 36-1) at ¶ 17. Plaintiff is 5'10" tall and, at the time of the incident, weighed about 170 pounds. (Doc. 36-1) at ¶ 13.

When EMT Defendants and their ambulance arrived at the restaurant, a few people had come out of the restaurant to "check on" Plaintiff and "try to calm" him down. (Doc. 25-2) at ¶ 6. No one from the restaurant held Plaintiff down nor did Plaintiff touch any of them.[3] *Id.*

Upon arriving at the restaurant, EMT Defendants each tightly grabbed Plaintiff's arms in an attempt to assess Plaintiff's vital signs.[4] *Id.* at ¶ 7; (Doc. 22-1) at ¶ 7; (Doc. 22-2) at ¶ 7. Plaintiff repeatedly asked EMT Defendants to let go, but they refused to do so. (Doc. 25-2) at ¶ 7. Plaintiff explained to EMT Defendants that he was "upset" about his son, who was in jail and facing a murder charge. *Id.* at ¶ 8. Plaintiff further stated that he needed to go back to work. *Id.*

EMT Defendants continued to hold Plaintiff and stated that they needed to take Plaintiff to the hospital. *Id.* at ¶ 9. EMT Defendants finally let go of Plaintiff after he pretended he was going to bite them. *Id.* While speaking to EMT Defendants, TPD Defendants arrived at about

---

[2] According to Defendant Collins, EMT Defendants informed him that they were called because Plaintiff reportedly collapsed at work, that Plaintiff's "cardiac rhythm was a concern," that Plaintiff may be having issues with his blood sugar, and that Plaintiff needed to go to the hospital for a medical examination. (Doc. 34-1) at ¶ 5. Defendant Garcia further attests that he was present when EMT Defendants informed Plaintiff that his heart rate was irregular and that he needed a medical examination at the hospital. (Doc. 34-2) at ¶ 6.

[3] EMT Defendants, however, attest that they saw three to four people holding Plaintiff when they arrived at the restaurant, and that Plaintiff was lethargic yet "combative and belligerent." (Doc. 22-1) at ¶¶ 4 and 6; (Doc. 22-2) at ¶¶ 4 and 6. When Defendant Collins later arrived at the restaurant he observed EMT Defendants and Ricky Trujillo, a bystander, holding Plaintiff onto a gurney. (Doc. 34-1) at ¶ 3.

[4] Defendant Collins observes in his Incident Narrative that those trying to hold Plaintiff's arms did so because Plaintiff was "flailing and swinging" his arms. (Doc. 25-5) at 1.

3:13 p.m. *Id.* at ¶ 10; (Doc. 42-1) at 2. Plaintiff recognized Defendant Garcia, who Plaintiff personally knew for several years.[5] (Doc. 36-1) at ¶ 33.

After Defendant Collins arrived at the restaurant, he spoke with EMT Defendants and bystanders about Plaintiff. One person stated that Plaintiff "[t]otally came unglued" while another stated that Plaintiff was "having a breakdown." (Doc. 42-3) at 2, pgs. 2-3 of transcript.[6] Another person, possibly an EMT Defendant, told Defendant Collins that Plaintiff is "obviously a medical risk" and will hurt himself if he is released. *Id.* at 4, pg. 12 of transcript. That person noted that when "we got" there ten people were holding Plaintiff. *Id.* The person told Defendant Collins that Plaintiff did not know where he was and "kind of passed out a little bit" before "swinging." *Id.* at 4, pg. 13 of transcript. According to an individual, Plaintiff was yelling and kicked him in the ankle a few times. *Id.* at 5, pg. 15 of transcript. Individuals also stated to Defendant Collins that Plaintiff was "not in his right mind," "just lost it," was "freaking out," and "spaced out for a while." *Id.* at 5, 6, and 8, pgs. 17, 18, and 24 of transcript.

One of the TPD Defendants, at some point, accused Plaintiff of being on drugs.[7] (Doc. 25-2) at ¶ 10. Defendant Collins finally told Plaintiff that he could voluntarily see a doctor, but, if he did not, Defendant Collins would sign a paper authorizing that Plaintiff be kept for up to 72

---

[5] Defendant Garcia attests that Plaintiff did not recognize him when he arrived at the restaurant, which concerned Defendant Garcia. (Doc. 34-2) at ¶ 5. Defendant Garcia also attests that Plaintiff finally recognized him at the hospital. *Id.* at ¶ 10.

[6] Citations to a transcript refer to the transcript of an audio recording Defendant Collins made during this incident. (Doc. 42-3). Plaintiff does not dispute the authenticity of the recording or the accuracy of the transcription. (Doc. 47) at 1-2. Except for Defendant Collins and Plaintiff, the speakers in the transcript are unidentified.

[7] Defendant Collins observed that Plaintiff's feet, fingers, and hands were twitching; Plaintiff was "sweating a lot;" Plaintiff's eyes were open "in an exaggerated manner;" Plaintiff was attempting to bite EMT Defendants; and that Plaintiff was yelling throughout the incident and would not calm down. (Doc. 25-5) at 1.

4

hours for an evaluation. (Doc. 42-3) at 7, pg. 26 of transcript. Defendant Collins explained to Plaintiff that he felt that Plaintiff was going to hurt himself or others. *Id.* Plaintiff refused to voluntarily see a doctor saying he would not be a danger to himself or others. *Id.* at 7, pgs. 27 and 28 of transcript. Plaintiff then threatened to beat Defendant Collins when Defendant Collins told Plaintiff that he can either ride in the ambulance or be handcuffed and ride in the back of the patrol car. *Id.* at 7, pg. 28 of transcript.

To get Defendants to leave, Plaintiff allowed EMT Defendants to check his vital signs and take a blood glucose level test, which was normal. *Id.* at ¶ 11; (Doc. 22-1) at ¶ 15. After EMT Defendants examined Plaintiff, he began to walk back to his restaurant. (Doc. 25-2) at ¶ 12. As he was walking, one of the TPD Defendants grabbed Plaintiff and stated that Plaintiff "would have to be tested for drugs." *Id.* After Plaintiff refused to be tested, one of the TPD Defendants forced Plaintiff into the ambulance[8] and onto a gurney. (Doc. 25-2) at ¶ 12.

Plaintiff's sister, Betty Cox, arrived at the scene when Plaintiff was already in the ambulance. (Doc. 25-4) at ¶ 4. Cox climbed into the ambulance through the passenger-side door and saw that Plaintiff was face-down on a gurney. *Id.* at ¶ 5. When Plaintiff attempted to get up from the gurney, a TPD Defendant "slammed" Plaintiff back onto the gurney with his knee on Plaintiff's back, and Defendant Collins jerked Plaintiff's right arm up to handcuff him.[9] *Id.* at ¶ 6; (Doc. 25-2) at ¶ 12; (Doc. 36-1) at ¶ 30. Cox told Defendants, repeatedly, to leave Plaintiff

---

[8] Defendant Collins states in the Incident Narrative that EMT Defendants put Plaintiff in the ambulance. (Doc. 25-5) at 1. Defendant Collins further states that Plaintiff "remained upset and combative" once in the ambulance. *Id.*

[9] EMT Defendants attest that Plaintiff initially agreed to go to the hospital but then became "very combative" causing TPD Defendants to handcuff him behind his back in order to transport him to the hospital. (Doc. 22-1) at ¶ 12; (Doc. 22-2) at ¶ 12. Defendant Garcia attests that Plaintiff was kicking while he was in the ambulance so Defendant Garcia assisted Defendant Collins in handcuffing Plaintiff to control him. (Doc. 34-2) at ¶¶ 7 and 8.

5

alone, that Plaintiff did not want to go to the hospital, and that she would care for him, but Defendants ignored her. (Doc. 25-4) at ¶ 7.

Before the ambulance left the scene, Defendant Collins completed a "Certification of Emergency Mental Health Evaluation for Psychiatric Hospitalization ('7-day')." (Doc. 34-3). Defendant Collins noted in the Certification that it was unknown whether Plaintiff was medically stable. *Id.* Defendant Collins further noted that (1) Plaintiff had a "sinkable" episode and when he came to Plaintiff was disoriented and combative; (2) Plaintiff was argumentative and claiming he was under "a lot of pressure;" (3) Plaintiff stated he was "overworked, taxed, and can't slow down;" (4) Plaintiff's extremities were twitching, he was "sweating profusely," and he was "verbally challenging;" and (5) Plaintiff admitted to "losing it for a while," and refused a voluntary evaluation. *Id.* Defendant Collins further noted that Plaintiff had poor eye contact; was hostile, agitated, anxious, loud, irritable, and angry; and had impaired insight/judgment. *Id.*

EMT Defendants then drove Plaintiff to the hospital against Plaintiff's will. (Doc. 25-2) at ¶ 13. During the ambulance ride, Plaintiff was handcuffed to the gurney and strapped face-down onto the gurney making it difficult for him to breathe. *Id.* at ¶¶ 13 and 16. Plaintiff stated to EMT Defendants that he was not going to pay for the ambulance and medical expenses, which he incurred against his will. *Id.* at ¶ 15. He did not threaten to harm himself or others during the entire incident.[10] *Id.* at ¶ 14.

---

[10] EMT Defendants state in their Prehospital Care Report that Plaintiff was "combative." (Doc. 25-3). Moreover, EMT Defendants' training and experience led them to believe that Plaintiff "was a danger to himself and others and that it was necessary to transport him to" the hospital. (Doc. 22-1) at ¶ 10; (Doc. 22-2) at ¶ 10. According to EMT Defendants, Plaintiff threatened bystanders and continued to threaten EMT Defendants on the way to the hospital. (Doc. 22-1) at ¶¶ 8and 13; (Doc. 22-2) at ¶¶ 8 and 13. Defendant Collins also attests that, while on the gurney inside the ambulance, Plaintiff was "physically combative" toward EMT Defendants. (Doc. 34-1) at ¶ 9.

6

Once at the hospital, Plaintiff was seated in a chair and TPD Defendants handcuffed Plaintiff to a bed. *Id.* at ¶ 17. Plaintiff admitted to Defendant Collins that he "lost it for a minute." (Doc. 42-3) at 10, pg. 37 of transcript. According to the Emergency Room report, Plaintiff stated that he was not combative and that Defendants "jumped him." (Doc. 36-3) at 2. The Emergency Room report, nonetheless, noted a combative and "verbally bellicose" general appearance, an initial impression of "agitation," and reference to a "psychotic break." *Id.* at 1-2. The Emergency Room report also noted an injury to Plaintiff's right shoulder. *Id.* at 2. While at the hospital, Plaintiff told Defendant Collins that Rick Trujillo, a bystander, twisted his arm while holding him onto a gurney. (Doc. 42-3) at 13, pg. 46 of transcript. Plaintiff suffered sprains and strains of his right shoulder and upper arm. (Doc. 25-8).

After one of the TPD Defendants spoke with hospital staff, a nurse drew Plaintiff's blood without his consent. (Doc. 25-2) at ¶ 18. TPD Defendants, however, did not "request, order, or authorize a blood draw…." (Doc. 34-1) at ¶ 13; (Doc. 34-2) at ¶ 11. Plaintiff was subsequently released from the hospital about an hour later. (Doc. 25-2) at ¶ 19. At that time, Plaintiff was cooperative, "very tired," but still "under stress." (Doc. 36-3) at 2.

*B. Discussion*

TPD Defendants argue first that they are entitled to qualified immunity with respect to the Fourth Amendment unreasonable seizure claims. Second, TPD Defendants argue that the community care doctrine, an exception to the Fourth Amendment, also provides them with immunity for seizing Plaintiff. Third, TPD Defendants argue that the undisputed material facts do not show that TPD Defendants violated the Fourth Amendment's prohibition on the use of excessive force, and so they are entitled to qualified immunity on the excessive force claims. Finally, TPD Defendants argue that the undisputed material facts do not show that TPD

7

Defendants violated the Fourth Amendment's prohibition on unreasonable searches, thereby entitling them to qualified immunity on the unreasonable search claims. Plaintiff opposes the Motion for Summary Judgment in its entirety.

*1. Summary Judgment and Qualified Immunity Standards*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

When a defendant moves for summary judgment on the basis of a qualified immunity defense, the Court "still view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in its favor." *Estate of Booker v. Gomez*, 745 F.3d 405, 411(10th Cir. 2014). Unlike other affirmative defenses, the plaintiff bears the burden of overcoming the defense of qualified immunity. *Id*. "This is a heavy burden." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1208 (10th Cir. 2017).

At the summary judgment stage, the Court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of*

*Booker*, 745 F.3d at 411. "[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). As the Tenth Circuit recently clarified:

> "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, "existing precedent must have placed the statutory or constitutional question 'beyond debate.'" "The dispositive question is 'whether the violative nature of the *particular conduct* is clearly established.'" In the Fourth Amendment context, "the result depends very much on the facts of each case," and the precedents must "squarely govern" the present case. "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"

*Garcia v. Escalante*, 2017 WL 443610, at *4 (10th Cir.) (quoting *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (citations omitted)).

   *2. Fourth Amendment Unreasonable Seizure Claims: Qualified Immunity*

Plaintiff argues that TPD Defendants lacked probable cause to seize him for an emergency mental health evaluation, thereby violating the Fourth Amendment's prohibition against unreasonable seizures. *See, e.g., Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996) ("Because a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive, we conclude that the 'probable cause' standard applies here, as do the New Mexico statutory provisions."). Officers meet that probable cause standard if they can "articulate specific facts that lead them to believe the person is a threat to herself or others." *Meyer v. Bd. of Cty. Comm'rs of Harper Cty., Okla.*, 482 F.3d 1232, 1240 (10th Cir. 2007). In other words, officers must have "probable cause to believe—that is a reasonable perception of a probability or substantial chance—that [the plaintiff] posed a danger to herself or others." *Id.* at 1239.

9

TPD Defendants argue that this case does not involve a seizure for an emergency mental health evaluation, but instead involves a seizure to treat Plaintiff's physical condition. Consequently, TPD Defendants cite *Peete v. Metro. Gov't of Nashville & Davidson Cty.* in which the Sixth Circuit held that paramedics do not unreasonably seize an individual if they acted solely to provide medical aid. 486 F.3d 217, 222 (6th Cir. 2007) (holding that paramedics did not unreasonably seize unconscious individual "because the paramedics acted in order to provide medical aid" and did not act "to enforce the law, deter or incarcerate.").

Viewing the evidence in the light most favorable to Plaintiff and making all reasonable inferences in favor of Plaintiff, a reasonable jury could find that, in addition to a concern for Plaintiff's physical well-being, TPD Defendants seized Plaintiff for an emergency mental health evaluation. *See* Certification of Emergency Mental Health Evaluation for Psychiatric Hospitalization (Doc. 34-3). Hence, TPD Defendants needed probable cause to believe Plaintiff was a threat to himself or others before they could seize him for an emergency mental health evaluation. When determining probable cause, the Court examines if the officer can reasonably draw a conclusion "from the facts known to the arresting officer at the time of the [seizure]." *Buck v. City of Albuquerque,* 549 F.3d 1269, 1281 (10th Cir. 2008) (internal quotation marks and citation omitted). Additionally, in the context of a qualified immunity defense, that probable cause must be "arguable" probable cause which "is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (internal quotation marks and citation omitted).

In this case, the undisputed evidence shows that once Defendant Collins arrived at the restaurant he learned from bystanders and EMT Defendants that Plaintiff had come "unglued,"

10

was "having a breakdown," was "not in his right mind," "just lost it," was "freaking out," "spaced out for a while," was disoriented, "kind of passed out a little" then started "swinging," and was yelling  Someone, possibly an EMT Defendant, also told Defendant Collins that Plaintiff was "obviously a medical risk" and would hurt himself if he is released, and that ten people had to hold Plaintiff.  Moreover, a person told Defendant Collins that Plaintiff kicked him in the ankle a few times while Plaintiff actually threatened to beat Defendant Collins.  Based on this undisputed evidence before Defendant Collins, an objectively reasonable officer, even if mistaken, could perceive a probable or substantial chance that Plaintiff was a threat to himself or others.  Accordingly, TPD Defendants had arguable probable cause to seize Plaintiff for an emergency mental evaluation.  Because Plaintiff has not carried his heavy burden of showing that TPD Defendants violated his Fourth Amendment right against an unreasonable seizure, TPD Defendants are entitled to qualified immunity on the Fourth Amendment unreasonable seizure claims raised in Count I of the Complaint.

*3. Unreasonable Seizure Claims:  Community Caretaker Doctrine*

TPD Defendants further argue that they enjoy immunity from suit on the unreasonable seizure claims under the community caretaker doctrine.  Because the Court finds that TPD Defendants are entitled to qualified immunity on the Fourth Amendment unreasonable seizure claims, it is unnecessary for the Court to determine whether TPD Defendants also have immunity for those Fourth Amendment claims under the community caretaker doctrine.

The Court, however, notes that TPD Defendants do not specify whether and to what extent the community caretaker doctrine, an exception to the Fourth Amendment, provides immunity for a seizure claim otherwise brought under the Fourteenth Amendment.  *See United States v. Gilmore*, 776 F.3d 765, 768-69 (10th Cir. 2015) (explaining one exception to Fourth

Amendment is community caretaking doctrine). TPD Defendants, therefore, have not carried their burden of showing that the community caretaker doctrine provides a basis for summary judgment, as a matter of law, on the Fourteenth Amendment unreasonable seizure claims.

　　　　*4. Fourth Amendment Excessive Force Claims: Qualified Immunity*

Next, Plaintiff argues that there are genuine issues of material fact which preclude qualified immunity and summary judgment on the Fourth Amendment excessive force claims he brings against TPD Defendants. A plaintiff may recover on an Fourth Amendment excessive force claim if he shows "(1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional." *Cortez v. McCauley*, 478 F.3d 1108, 1129 n. 25 (10th Cir. 2007). In determining a Fourth Amendment excessive force claim, courts "consider the facts and circumstances confronting the officers, judging reasonableness ... from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1248 (10th Cir. 2013) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted)). For instance, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, ... the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *limited on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Relevant factors in analyzing excessive force issues "include, but are not limited to, '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Cavanaugh*, 718 F.3d at 1249 (quoting *Graham*, 490 U.S. at 396). Under the third factor, "the relevant inquiry is whether the [force used by the officers] was reasonable and

proportionate given [the arrestee's] resistance." *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016).

Here, no crime was at issue, but, as discussed above, Plaintiff's previous actions as conveyed to Defendant Collins and Plaintiff's comments to Defendant Collins would lead a reasonable officer to believe that Plaintiff posed an immediate threat to the safety of the officers or others. Further, it is undisputed that Plaintiff was actively resisting the seizure by trying to get up off the gurney while in the ambulance. Considering that it is undisputed that (1) Plaintiff was upset and did not want to go by ambulance to the hospital; (2) Defendant Collins heard from others that ten people had to hold Plaintiff, that Plaintiff kicked someone in the ankle several times, and that Plaintiff was having some kind of mental breakdown; and (3) Plaintiff threatened to beat Defendant Collins, officers under those conditions could reasonably believe that Plaintiff would fight back when they tried to transport him to the hospital. In that situation, even if TPD Defendants were mistaken, they were justified in using more force than was actually needed to get Plaintiff to stay on the gurney and to handcuff him for transportation to the hospital. Despite Plaintiff's age, height, and weight, factors not necessarily relevant to Plaintiff's excessive force claims,[11] the Court determines that TPD Defendants used reasonable and proportionate force to effect the seizure given the circumstances described above. Consequently, the Court determines that Plaintiff has not carried his heavy burden of demonstrating that TPD Defendants violated Plaintiff's Fourth Amendment right to be free from excessive force. TPD Defendants are, therefore, entitled to qualified immunity as to those Fourth Amendment excessive force claims brought in Count II of the Complaint.

---

[11] No evidence indicates whether Plaintiff was in particularly good physical condition or not.

### 5. Fourth Amendment Unreasonable Search Claims: Qualified Immunity

Plaintiff also argues that TPD Defendants violated the Fourth Amendment by unlawfully causing his blood to be drawn at the hospital without his consent. "Indeed, as the Supreme Court has noted, it is clearly established that blood tests constitute searches under the Fourth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 740 (10th Cir. 2007) (citing *Schmerber v. California*, 384 U.S. 757, 767-68 (1966)). Plaintiff, however, has not presented a reasonable inference let alone any actual evidence that TPD Defendants caused the blood draw at the hospital by requesting the draw. Moreover, Plaintiff has not cited any legal authority to support the contention that police officers can be held liable under Section 1983 for a blood draw they did not participate in. *Cf. Cook v. Olathe Med. Ctr., Inc.*, 773 F.Supp.2d 990, 1002-003 (D. Kan. 2011) (determining that plaintiff was not entitled to summary judgment on Fourth Amendment claim when police officers did not order blood and urine draws and merely restrained plaintiff during draws). Under these circumstances, Plaintiff has failed to carry his heavy burden of demonstrating that (1) TPD Defendants violated Plaintiff's Fourth Amendment right to be free from an unreasonable search when hospital personnel drew Plaintiff's blood, and (2) every reasonable police officer would have understood that he or she violates the Fourth Amendment's prohibition against unreasonable searches when hospital personnel draw blood from an individual the police officer caused to be transported to the hospital for further evaluation. TPD Defendants are, therefore, entitled to qualified immunity with respect to the Fourth Amendment unreasonable search claims brought in Count III of the Complaint.

### C. Conclusion

In sum, the Court will enter summary judgment in favor of TPD Defendants on all of Plaintiff's Fourth Amendment claims, but deny summary judgment on the Fourteenth

Amendment claims, which TPD Defendants did not specifically argue are subject to summary judgment. The Court has already entered summary judgment on all of the Fourth Amendment claims brought against EMT Defendants and denied summary judgment on the Fourteenth Amendment claims against those Defendants, because they did not provide legal authority to support summary judgment on the Fourteenth Amendment claims. (Doc. 48).

As to the outstanding Fourteenth Amendment claims, the Court notes "[s]uch claims are properly considered under the Fourth Amendment rather than under the more general substantive due process analysis of the Fourteenth Amendment." *Berglund v. Pottawatomie Cty. Bd. of Cty. Comm'rs*, 350 F. App'x 265, 268 (10th Cir. 2009) (citing *Becker v. Kroll,* 494 F.3d 904, 919 (10th Cir.2007)). As the Tenth Circuit has explained, '"[t]he more general due process considerations of the Fourteenth Amendment are not a fallback to protect interests more specifically addressed by the Fourth Amendment' in the context of the initial stages of a criminal proceeding." *Id.* (quoting *Becker*, 494 F.3d at 919). Considering this well-established law, the Court will order Plaintiff to show cause why the Fourteenth Amendment claims should not be dismissed without prejudice for failure to state a cognizable claim under Rule 12(b)(6).

IT IS ORDERED that

1. Defendants Collins and Garcia's Motion for Summary Judgment (Doc. 34) is granted in part and denied in part;

2. summary judgment will be entered in favor of TPD Defendants as to the Fourth Amendment claims brought in Counts I, II, and III of the Complaint;

3. those Fourth Amendment claims will be dismissed with prejudice;

4. summary judgment is denied at this time as to the Fourteenth Amendment claims brought against TPD Defendants in Counts I, II, and III of the Complaint;

5. on or before June 30, 2017, Plaintiff must show cause why the Fourteenth Amendment claims should not be dismissed for failure to state a cognizable claim under Rule 12(b)(6);

6. failure to answer this order to show cause will result in dismissal of the Fourteenth Amendment claims with prejudice; and

7. Defendants may file a response to Plaintiff's answer to this order to show cause no later than July 14, 2017, while Plaintiff may file a reply by July 28, 2017.

*[signature]*
UNITED STATES DISTRICT JUDGE